## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMES LUCA,

        Plaintiff,

v.

                                      Case No. 2:23-cv-12393
                                      Magistrate Judge Anthony P. Patti

SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## (ECF No. 19)

Plaintiff James Luca was an employee at the Social Security Administration ("Agency"). This is one of four lawsuits he has brought in this Court in the past three years against the Agency related to his employment.[1] In the case at bar, he claims that the Agency wrongly passed him over for various posted positions based

---

[1] *See Luca v. Comm'r of Soc. Sec.*, 2:23-cv-11966, 2025 WL 2463150 (E.D. Mich. Aug. 26, 2025); *Luca v. Comm'r of Soc. Sec.*, No. 4:22-cv-11169, 2024 WL 4340706 (E.D. Mich. Sept. 27, 2024), *aff'd*, No. 24-2039, 2025 U.S. App. LEXIS 23044, at *12 (6th Cir. Sept. 5, 2025) ("[T]he evidence is nearly overwhelming that Luca's abuse of the [Agency]'s leave policies was the sole reason for its termination decision."); *Luca v. Kijakazi*, No. 4:22-cv-12001 (E.D. Mich. Sept. 29, 2023).

on his age, race, color, sex, and past attempts to pursue discrimination claims against it.

The parties consented to my jurisdiction to resolve this action.  Because no reasonable jury would find that the Agency discriminated against Luca with respect to one of the non-selections and every reasonable jury would find that the Agency had legitimate, non-discriminatory reasons for the other non-selections, all Luca's claims fail.  The Court shall grant summary judgment for the Agency.

## FACTUAL BACKGROUND

In 2014 and 2015, Luca applied for higher posts with his employer, the Agency.  Those promotions were governed by a merit promotion plan that the Agency had negotiated with the American Federation of Governmental Employees (hereinafter, the "Plan").  The Agency did not pick Luca for any of the positions. He later challenged those non-selections in administrative proceedings before the Agency and later the Equal Employment Opportunity Commission ("EEOC"). Neither the Agency nor the EEOC found any wrongdoing.  This suit followed.

## I.    The Plan's Merit Selection Rules

The starting point for the Plan's selection rules is the federal government's General Schedule pay system, which consists of "GS levels" numbered one through fifteen.[2]  For General Schedule jobs, the employee holding the job has a

---

[2] This information regarding the Plan's merit selection rules comes from the Plan

GS level.  The higher the GS level, the better the employee's salary and other benefits, and an employee's GS level may be increased as they become more experienced.  Some General Schedule jobs also have a terminal GS level.  An employee who reaches a terminal GS level cannot advance to a higher GS level without switching jobs.

The jobs at issue here were General Schedule jobs with a terminal GS level of 11.  And the Agency was looking to hire applicants at the GS-5, GS-7, GS-9, and GS-11 levels, or some combination thereof.  Applicants had to qualify for a particular GS level based on experience, education, and other factors to be hired at that GS level.  And applicants had to state the lowest GS level they would accept.

After the job listings at issue here closed, the Agency first determined whether all the applicants for each job qualified for the lowest GS level they had said they would take, as well as all higher available GS levels.  The Agency then made separate, ranked lists for each GS level consisting of all the applicants who were eligible at that GS level.  And the criterion for *ranking* applicants at each GS level were different than the factors the Agency used to determine applicants' *eligibility* for a certain GS level.

After creating these ranked lists for each GS level, the Agency trimmed all but the ten most qualified applicants from each list with more than ten applicants.

_____

(ECF No. 19-6) and an affidavit from an Agency employee (ECF No. 19-4).

For lists with fewer than ten applicants, all the applicants remained on the list. The resulting lists, which the Agency called "best qualified" or "BQ" lists, were then sent to the selection officials. When an applicant's name was listed on a certain BQ list, it was said that the applicant had been "referred" at that GS level. And selection officials could pick an applicant from any of the BQ lists; officials were not, for example, required to choose from the BQ list for the highest GS level.[3]

## II.    The Vacancies

Luca applied for positions as a claims representative at the Agency's Ann Arbor, Farmington Hills, Wyandotte, Detroit Conner, Roseville, Inkster, and Highland Park offices, all of which were in Michigan.[4]  He was eligible for GS-11

---

[3] For example, assume an applicant, April, applied for a vacancy that was open to applicants at the GS-5 level and up. Assume she was eligible at the GS-9 level and applied at the GS-7 level. Assume also that she was among the top ten highest-ranked GS-9-eligible applicants but not among the top ten highest-ranked GS-7-eligible applicants. She would have been referred at the GS-9 level because she was among the top ten GS-9-eligible applicants. But she would *not* have been referred at the GS-5 level because she had applied at the GS-7 level; nor at the GS-7 level because she was not among the top ten GS-7-eligible applicants; nor at the GS-11 level because she was not GS-11-eligible. If the selection official wished to hire someone at the GS-5, GS-7, or GS-11 levels, the official would not have considered April for the job. And if the official considered GS-9-eligible applicants, then April would have had to beat out the other nine applicants who had been referred at that level.

[4] In the papers the parties also discuss vacancy number 1213695, which was for an administrative assistant position at the Agency's office of disability adjudication and review. Luca applied for that vacancy, and he was not selected. At his deposition, Luca explained that he was not challenging "any aspect of [the Agency's] decision" in connection with this vacancy. (Luca Dep. 76:19–21, ECF No. 19-2.) In his response to the Agency's motion for summary judgment, he uses the Agency's selection process for this vacancy as an example of what he believes should have

level jobs, but he applied at lower GS levels.  None of the offices picked him.  In late 2015, the selection officials authored affidavits explaining why.

### A.    Ann Arbor (Vacancy No. 1218768)

The Ann Arbor vacancy was open to GS-7 through GS-11-level applicants. (ECF No. 19-7, PageID.288.)  Luca applied at the GS-7 level, and he ranked eighteenth out of twenty-two among GS-7-eligible applicants; twenty-fourth out of twenty-nine among GS-9-eligible applicants; and last among four GS-11-eligible applicants.  (Cruz Aff. ¶ 33, ECF No. 19-4.)  He was thus only referred at the GS-11 level.  (*Id.* ¶ 32.)

The Agency hired Megan Westhoff, a thirty-year-old white woman, at the GS-9 level.  (Laird Aff. ¶ 30, ECF No. 19-11; ECF No. 19-9, PageID.328.) Westhoff was hired because her "manager [had] provided positive feedback"; and she had "a good work history," "good performance ratings," and "a number of years of experience as Service Representative."  (Laird Aff. ¶ 32; *see also* ECF No. 19-12.)  Westhoff's experience mattered because "Service Representatives have the background and experience to later become a Claims Representative."  (Laird Aff. ¶ 32.)  The selection official was also "familiar with [Westhoff's] quality work."  (*Id.*)

---

happened with the other vacancies. The Court accordingly assumes that Luca is not bringing any claims in connection with this vacancy.

Luca was not hired because he "did not have the necessary experience as a Service Representative or background." (*Id.* ¶ 34.)  And Luca learned that he was not selected for the Ann Arbor position on or about November 4, 2014.  (Luca Aff. ¶ 29, ECF No 19-3.)

### B.    Farmington Hills (Vacancy No. 1222414)

The Farmington Hills vacancy was open to GS-5 through GS-11 level applicants.  (ECF No. 19-7, PageID.296.)  Luca applied at the GS-5 level, and he ranked last among fourteen GS-5-eligible applicants; twenty-first out of twenty-three among GS-7-eligible applicants; thirtieth out of thirty-one among GS-9-level applicants; and last among seven GS-11-eligible applicants.  (Cruz Aff. ¶ 33.)  He was thus only referred at the GS-11 level.  (*Id.* ¶ 32.)

The Agency hired Bernard Reese, a forty-nine-year-old black man, at the GS-5 level.  (Vanacker Aff. ¶ 29, ECF No. 19-13; ECF No. 19-9, PageID.320.)  Reese was hired because he "was a quick study," "worked hard," "reported to work on a daily basis," "dealt well with the public," and "was a team player."  (Vanacker Aff. ¶ 32; *see also* ECF No. 19-14.)

Luca was not hired because the selection official wanted to hire someone at the GS-5 level, and Luca had not been referred at that level.  (*See* Vanacker Aff. ¶ 33.)  And Luca learned that he was not selected on October 24, 2014.  (Luca Aff. ¶ 24.)

### C.    Wyandotte (Vacancy No. 1307511)

The Wyandotte vacancy was open to GS-7 through GS-11-level applicants. (ECF No. 19-7, PageID.307.)  Luca applied at the GS-7 level, and he ranked twelfth out of fourteen among GS-7-eligible applicants; twenty-first out of twenty-three among GS-9-eligible applicants; and last among three GS-11-eligible applicants.  (Cruz Aff. ¶ 33.)  He was thus only referred at the GS-11 level.  (*Id.* ¶ 32.)

The Agency hired Clarena Zapata, a forty-year-old Hispanic woman, at the GS-9 level.  (Gould Aff. ¶ 30, ECF No. 19-15; *see* ECF No. 19-19, PageID.320.) Zapata was hired because she "had the right experience[,]" "was highly recommended by her supervisor[,]" bilingual, and "a member of [the selection official's] management team had previously worked with her and was familiar with her work and her work ethics."  (Gould Aff. ¶ 32.)

Luca was not hired because the selection official "did not consider" any applicants who had been referred at the GS-11 level.  (*Id.* ¶ 33)  And the official did not consider any such applicants because none of them were already working as a claims representative.  (*See id.*)  That mattered to the official because he "did not want to hire someone at a journeyman level that would be a trainee."  (*Id.*)

### D.    Detroit Conner (Vacancy No. 1308237)

The Detroit Conner vacancy was open to GS-7 through GS-11-level

7

applicants, and there were two positions available.  (ECF No. 19-7, PageID.289–95.)  Luca applied at the GS-7 level, and he ranked last among thirteen GS-7-eligible applicants; last among twenty-two GS-9-eligible applicants; and last among five GS-11-eligible applicants.  (Cruz Aff. ¶ 33.)  He was thus only referred at the GS-11 level.[5]  (*Id.* ¶ 32.)

The Agency hired Viola Alston, a fifty-five-year-old black woman, at the GS-9 level.  (Dabish Aff. ¶ 32, ECF No. 19-16; ECF No. 19-19, PageID.321.)  Alston was hired because "[s]he was the second highest rated candidate on the [GS-9] BQ list" and "deal[t] well with difficult personalities."  (Dabish Aff. ¶ 35; *see also* ECF No. 19-17.)  Also, the selection official had "received a high recommendation" from Alston's supervisor and "believed [Alston] would be a good fit for [the Detroit Conner] office."  (Dabish Aff. ¶ 35.)

The Agency additionally hired James Custer, a thirty-eight-year-old white man, at the GS-9 level.  (Dabish Aff. ¶ 32; ECF No. 19-19, PageID.321.)  Custer was hired "because he was the top rated candidate," "had prior experience in a 30-day detail in [the Detroit Conner] office," "did outstanding work," and "was very much a team player."  (Dabish Aff. ¶ 35; *see also* ECF No. 19-17.)

---

[5] Because there were two positions available at the Detroit Conner office, an additional two applicants were referred at each GS level for which there were at least ten eligible applicants. (*See* Cruz Aff. ¶ 22.) This didn't help Luca because he was not among the top twelve GS-7 or GS-9-eligible applicants.

Luca wasn't hired because the selection official did not want to hire someone at the GS-11 level. (*See* Dabish Aff. ¶ 36.) And the official didn't want to hire someone at the GS-11 level because the official "did not want the candidate to start as a trainee at the journeyman level." (*Id.*)

### E.    Roseville (Vacancy No. 1320439)

The Roseville vacancy was open to GS-5 to GS-11-level applicants. (ECF No. 19-7, PageID.306.) Luca applied at the GS-5 level, and he ranked eighth out of ten among GS-5-eligible applicants; fifteenth out of sixteen among GS-7-eligible applicants; last out of twenty among GS-9-eligible applicants; and last out of six among GS-11-eligible applicants. (Cruz Aff. ¶ 33.) He, therefore, should have been referred at the GS-5 and GS-11 levels, but he was not referred at any GS level. (*Id.* ¶ 32.)

The Agency hired Julia Wilkins, a thirty-seven-year-old black woman, at the GS-7 level. (Shelton Aff. ¶ 33, ECF No. 19-18; ECF No. 19-19, PageID.323.) Wilkins was hired because she "had expansive technical knowledge, which she shared with others"; "was able to control the numerous volumes of workload while balancing the continual interviews being conducted on a daily basis"; "had a positive demeanor while approaching tasks"; and had "a strong determination for the success of those tasks." (Shelton Aff. ¶ 36.) And the selection official "had worked with . . . Wilkins and had [had] an opportunity to observe her work." (*Id.*)

9

Luca wasn't hired because "his name did not appear on any of the BQ lists/certifications that [the selection official had] received."  (*Id.* ¶ 37.)  Human resources specialist Dana Babiarz was responsible for referring applicants for the Roseville job.  (Cruz Aff. ¶ 47.)  Babiarz would later concede that Luca "should have been referred at the GS-5 and GS-11 grade levels."  (Babiarz Aff. ¶ 33, ECF No. 19-5.)  The Agency says that Babiarz also improperly failed to refer *three other* applicants to the Roseville selection official.[6]  (Def.'s MSJ 9 n.1, ECF No. 19.)  In any case, even if Luca and the others had been referred for the Roseville job, he still would have ranked near the bottom at each level.

### F.    Inkster (Vacancy No. 1348824)

The Inkster vacancy was open to GS-7 through GS-11-level applicants.  (ECF No. 19-7, PageID.304.)  Luca applied at the GS-7 level, and he ranked twelfth out of fourteen among GS-7-eligible applicants; nineteenth out of twenty-two among GS-9-eligible applicants; and last out of four GS-11-eligible applicants.  (Cruz Aff. ¶ 33.)  He was thus only referred at the GS-11 level.  (*Id.* ¶ 32.)

The Agency hired Cecelia Roseberry, a thirty-nine-year-old black woman, at the GS-7 level.  (Cheok Aff. ¶ 30, ECF No. 19-20; ECF No. 19-9, PageID.324.)

---

[6] In support, the Agency points to a document listing all the applicants for the Roseville vacancy and the scores that the Agency used to determine their ranks at their qualifying GS levels. (ECF No. 19-31.) But this document is full of jargon that the Agency doesn't explain, so it's unclear whether the document supports the Agency's position.

Roseberry was hired because she had: "been with the Agency since 2008"; "experience processing Claims Representative workload"; "completed an individual development plan to be a Claim Representative"; "completed a 30-day detail in a different office processing Claims Representative work"; and "received the Regional Commissioner's Team Award in 2012." (Cheok Aff. ¶ 32; *see also* ECF No. 19-21.)

The selection official "considered candidates on the GS-11 list." (Cheok Aff. ¶ 33.) Yet the official "had no specific reason" for not hiring Luca, although his last-place ranking cannot have put him in good stead for the position. (*Id.*)

### G.     Highland Park (Vacancy No. 1346812)

The Highland Park vacancy was open to GS-5 and GS-7-level applicants through the federal government's Pathways Recent Graduates Program ("Program"). (*See* ECF No. 19-7, PageID.297–303.) Program jobs are only available to recent graduates. (*See id.*) Luca was not referred at any GS level because he "did not submit evidence to meet the . . . Program requirements (recent college graduate)." (Cruz Aff. ¶ 30; *see also* ECF No. 19-22.)

The Agency hired Troy Alexandridis, a thirty-one-year-old white man, at the GS-7 level. (Lopez Aff. ¶ 32, ECF No. 19-23; ECF No. 19-19, PageID.322.) Alexandridis was hired because he: "was a recent graduate with a Master's Degree in Public Administration"; "possessed a Bachelor's Degree in Political Science and

Public Administration"; had "exhibited interpersonal skills"; "had a background in public service"; "was a veteran"; had had a "bad experience in sales and interacted with large volumes of individuals"; had "represented himself well and communicated well"; and had "showed he could adapt to the position." (Lopez Aff. ¶ 34.)

## III.   Administrative Proceedings

Luca suspected that his age, race, color, sex, and past attempts to pursue discrimination claims against the Agency had had something to do with the non-selections, so he sought administrative relief under the EEOC's regulations. In 2014 and 2015 those regulations required him to first "consult a Counselor . . . in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a) (2015). A "Counselor" was an Agency employee tasked with reviewing discrimination claims against the Agency. *See id.* § 1614.102(b)(6). The EEOC regulations required Luca to "initiate contact with a Counselor within 45 days of the" non-selections. *Id.* § 1614.105(a)(1).

If counseling did not work, then Luca could file with the Agency an administrative complaint alleging discrimination. *Id.* § 1614.106. The Agency could either accept his claims for investigation or reject them on their face. *Id.* § 1614.107. He could then request a hearing before an administrative law judge ("ALJ"). *Id.* § 1614.108. If he requested a hearing, then the ALJ then had to issue

an order resolving his claims.  *Id.* § 1614.109.  The ALJ's order would become the "final action" of the Agency on his claims unless the Agency issued some other decision within forty days.  § 1614.109(i).  And if he was unhappy with the Agency's final action, then he could appeal to the EEOC.  *Id.* § 1614.110.

On January 15, 2015, Luca emailed the Agency to initiate counseling for the Ann Arbor, Farmington Hills, Wyandotte, Detroit Conner, Roseville, Inkster, and Highland Park non-selections.[7]  (*See* ECF No. 19-24, PageID.417.)  Counseling did not work, so on the same day, a few months later, he filed with the Agency two administrative complaints alleging that all the non-selections had been discriminatory.  (*See* ECF No. 19-25.)  The Agency accepted all Luca's claims for investigation.  (ECF No. 19-26.)

Luca later requested a hearing before an ALJ.  (*See* ECF No. 19-28.)  The ALJ construed his administrative complaints together and rejected all his claims. The ALJ dismissed as untimely his challenges to the Ann Arbor and Farmington Hills non-selections because, the ALJ found, he had failed to contact a Counselor within forty-five days after he had learned of those non-selections.  The ALJ also dismissed his challenge to the Highland Park non-selection because, the ALJ

---

[7] Exactly what non-selections Luca sought counseling to resolve is unclear. Construing the record in the light most favorable to him, he sought counseling for all the non-selections at issue, although the Court does not assume the timeliness of all such counseling requests.

stated, Luca had withdrawn that challenge.  The ALJ found for the Agency on his remaining challenges.  And nothing in the record suggests that the Agency issued a contrary ruling within forty days.

Luca appealed to the EEOC.  In his EEOC appeal, he "only dispute[d] the [ALJ]'s finding of no discrimination regarding his non-selection for the Roseville . . . position."  (ECF No. 19-30, PageID.445.)  The EEOC affirmed the ALJ, and this action followed.

## PROCEDURAL HISTORY

Luca's complaint is entitled "Complaint for Employment Discrimination," and it cites the Age Discrimination and Employment Act of 1967 ("ADEA") and title VII of the Civil Rights Act of 1964 ("Title VII").[8]  (ECF No. 1, PageID.1.)

---

[8] The complaint also cites the Americans with Disabilities Act of 1990 ("ADA"). But Luca does not discuss the ADA anywhere else in the papers, so the Court considers any ADA claim abandoned. And the ADA does not apply to the federal government in any event. *See* 42 U.S.C. § 12111(5)(B)(i) (excluding "the United States" from the ADA's definition of "employer"); *Green v. Postmaster Gen.*, No. 04-73805, 2007 WL 1017000, at *1 n.1 (E.D. Mich. Mar. 29, 2007); *accord Brown v. Austin*, 13 F.4th 1079, 1084 n.3 (10th Cir. 2021); *Calero-Cerezo v. DOJ*, 355 F.3d 6, 11 n.1 (1st Cir. 2004); *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998).

The complaint additionally cites provisions of the Civil Service Reform Act of 1978 ("CSRA") and its implementing regulations. *See* 5 U.S.C. § 2302; 5 C.F.R. pt. 335 (2025). CSRA also prohibits discrimination by federal agencies, *see* § 2302(b)(1), but substantive anti-discrimination statutes such as the ADEA and Title VII make such discrimination actionable in federal court, *see Ryon v. O'Neill*, 894 F.2d 199, 203 (6th Cir. 1991) ("The text of the CSRA providing for review of personnel actions . . . contains no mention whatsoever of judicial review."). The Court accordingly presumes that Luca only brings claims under the ADEA and Title VII.

14

The ADEA's federal-sector provisions prohibited the Agency from not promoting Luca based on his age.  29 U.S.C. § 633a(a).  And Title VII's federal-sector provisions prohibited the Agency from not promoting him based on his race, color, or sex.  42 U.S.C. § 2000e-16(a).

Luca fleshed out his discrimination claims at his deposition.  He detailed so-called disparate treatment claims—claims that the Agency didn't promote him based on discriminatory animus—in connection with the non-selections:

- age and sex discrimination by the Ann Arbor office;

- race and color discrimination by the Farmington Hills office;

- age, race, color, and sex discrimination by the Wyandotte office;

- age, race, color, and sex discrimination by the Detroit Conner office;

- age and sex discrimination by the Roseville office;

- age, race, and sex discrimination by the Inkster office; and

- age discrimination by the Highland Park office.

(*See* Luca Dep. 42:22, 57:20–21, 82:10, 99:20, 123:8, 147:17, 162:18, ECF No. 19-2; *see also* Luca Dep. 37:1–12, 40:12–19, ECF No. 19-2, PageID.139 (identifying Luca's claims here as consistent with his EEO complaint, namely, for employment discrimination based on various protected classes).)  He also detailed retaliation claims—claims that the Agency didn't promote him based on his past prosecution of discrimination claims against it—under the ADEA and Title VII in

connection with the Ann Arbor, Farmington Hills, Wyandotte, Detroit Conner, and Inkster non-selections (but not the Roseville or Highland Park non-selections).[9] (*See id.* at 57:20, 82:10, 99:20, 147:20, 162:18.)

The Agency seeks summary judgment. The Agency asserts an affirmative defense to some of Luca's claims and argues that they all fail in any event. No hearing on the Agency's motion is necessary.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] Fed. R. Civ. P. 56(a). And parties genuinely dispute material facts if, "taking the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, 'a reasonable jury could return a verdict for the nonmoving party.'" *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 844 (6th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[9] Luca does not explicitly say that his retaliation claims arise under the ADEA and Title VII. The Court presumes they do, however, because he brings his disparate-treatment claims under those statutes.

[10] This Court reviews ADEA and Title VII claims *de novo* and does not defer to the federal agency or the EEOC. *See Solimino v. Astoria Fed. Sav. & Loan Ass'n*, 901 F.2d 1148, 1151–52 (2d Cir. 1990) (ADEA); *Abrams v. Johnson*, 534 F.2d 1226 (6th Cir. 1976) (Title VII).

A defendant is entitled to summary judgment if it shows that the plaintiff cannot "establish the existence of an element essential to [the plaintiff]'s case, and on which [the plaintiff] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To do that, "the defendant's summary-judgment briefing need only show that the record lacks evidence from which 'a rational trier of fact' could find for the plaintiff on the issue." *Lemaster v. Lawrence County*, 65 F.4th 302, 309 (6th Cir. 2023) (quoting *Quoc Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)).

If the defendant discharges this burden, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The plaintiff "must come forward with specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587 (citation modified).

But when a defendant seeks summary judgment on an affirmative defense, "its burden of production is greater" because it must prove the defense at trial.  *Id.* at 310 (quoting 10A *Wright & Miller's Federal Practice & Procedure* § 2727.1 (4th ed. 2016)).  A defendant who seeks summary judgment on an affirmative defense, accordingly, "must affirmatively introduce evidence of such weight that no rational jury could disagree with it."  *Id.*

## ANALYSIS

The Agency argues that it has a meritorious affirmative defense to some of Luca's disparate-treatment and retaliation claims, and that all those claims otherwise fail in any event.

## I.      Failure to Exhaust Administrative Remedies

The Agency argues that Luca's challenges to the Ann Arbor, Farmington Hills, and Highland Park non-selections are barred because he failed to exhaust administrative remedies. Luca's challenges to the Ann Arbor and Farmington Hills non-selections arise under Title VII and the ADEA,[11] and his challenge to the Highland Park non-selection only arises under the ADEA.[12] And "exhaustion of administrative remedies[] is an affirmative defense." *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012); *see also Rembisz v. Lew*, 590 F. App'x 501, 503–04 (6th Cir. 2014) (addressing Title VII's federal-sector provision).

### A.      Title VII

"The right to bring an action under Title VII regarding equal employment [opportunity] in the federal government is predicated upon the timely exhaustion of

---

[11] Luca claims that the Ann Arbor office didn't promote him based on his age and sex; that the Farmington Hills office didn't promote him based on his race and color; and that both offices didn't promote him based on his prior enforcement activities under the ADEA and Title VII. (Luca Dep. 57:20–21, 82:10.)

[12] Luca claims that the Highland Park office didn't promote him based on his age. (Luca Dep. 42:22). And he does not bring a retaliation claim in connection with this non-selection. (*See id.* at 41–57.)

18

administrative remedies, as set forth in [the EEOC regulations]." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009) (alterations in original) (quoting *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991)). Here, the EEOC regulations required Luca to contact a Counselor within forty-five days after the non-selections. *See* 29 C.F.R. § 1614.105(a)(1) (2015).

This forecloses Luca's Title VII challenges to the Farmington Hills and Ann Arbor non-selections. He learned of the Farmington Hills non-selection on October 31, 2014, and he learned of the Ann Arbor non-selection on or around November 4, 2014. That means he had to contact a Counselor for both non-selections in mid-December 2014. But he first emailed the Agency to initiate counseling in January 2015. As such, he failed to timely exhaust under Title VII administrative remedies for both those non-selections.

## B.    The ADEA

The ADEA "provides two alternative routes for pursuing a claim of age discrimination [against a federal agency]. An individual may invoke the EEOC's administrative process and then file a civil action in federal district court if he is not satisfied with his administrative remedies." *Stevens v. Dep't of Treasury*, 500 U.S. 1, 5 (1991); *see also* 29 U.S.C. § 633a(b), (c). But an individual "does not have to seek relief from his employing agency or the EEOC at all. He can decide to present the merits of his claim to a federal court in the first instance" by giving

the EEOC notice of intent to sue.  *Stevens*, 500 U.S. at 6; *see also* § 633a(d).

At first blush, the Sixth Circuit may seem to have given conflicting signals on how these routes work.  In *Langford v. U.S. Army Corps of Engineers*, 839 F.2d 1192 (6th Cir. 1988), plaintiffs contacted a Counselor under the EEOC regulations and alleged age discrimination by their employer, the Army Corps of Engineers. *Id.* at 1192.  They later filed an administrative complaint with the Corps, the Corps rejected their claims, and they appealed to the EEOC.  *Id.* at 1192–93.  Before the EEOC reached their appeal, however, they brought their claims against the Corps in federal court.  *Id.* at 1193.  The Corps argued that the plaintiffs had not exhausted their administrative remedies, but the Sixth Circuit disagreed: "The ADEA places no limitations on the filing of a civil action when an employee has filed an age discrimination complaint with the EEOC."  *Id.* at 1195.

*Langford* suggests that a plaintiff need only *file* an administrative complaint alleging age discrimination by a federal agency to sue the agency in federal court. But *Hunter v. Secretary of U.S. Army*, 565 F.3d at 986, suggests otherwise.  There, the plaintiff untimely contacted a Counselor under the EEOC regulations and alleged age discrimination by his employer, the U.S. Army.  *Id.* at 990.  He then filed an administrative complaint with the Army, the Army rejected his claim, he appealed to the EEOC, and the EEOC affirmed.  *Id.*  He later sued the Army in federal court, and the district court dismissed because he had not timely contacted

a Counselor under the EEOC regulations.  *Id.* at 990–92.  The Sixth Circuit

affirmed, finding that the plaintiff's claims "were time-barred."  *Id.* at 994.

 *Langford* and *Hunter* are reconcilable.  Although under *Lanford* a plaintiff

need only file an administrative complaint alleging age discrimination by a federal

agency to sue the agency under the ADEA in federal court, *Hunter* recognizes that

an administrative complaint must still be *timely*.  Otherwise, a plaintiff could

resurrect a long-dormant age-discrimination claim by filing an administrative

complaint years after the fact.  And a plaintiff's failure to timely contact a

Counselor under the EEOC regulations regarding an age-discrimination claim

renders any later-filed administrative complaint alleging that claim untimely.[13]

 Here, Luca's age-discrimination challenges to the Ann Arbor and

Farmington Hills non-selections fail under *Hunter*.  Although he filed

administrative complaints challenging those non-selections, he did not contact a

Counselor within forty-five days after those non-selections occurred as the EEOC

regulations required.  *See* § 1614.105(a)(1).

 The Agency argues that the ADEA also bars Luca's age-discrimination

challenge to the Highland Park non-selection because he abandoned it before the

---

[13] *Hunter* also did not address whether the plaintiff had given the EEOC notice of
his intent to sue. *See Hunter*, 565 F.3d at 986. Thus, *Hunter* impliedly recognizes
that a federal agency sued for violating the ADEA need not prove that a plaintiff
who untimely filed an administrative complaint detailing his claims also failed to
give the EEOC notice of his intent to sue.

ALJ reached it.  But the Agency points to nothing showing that his contact with the Counselor was untimely for that non-selection or that he otherwise untimely filed his administrative complaints.  Thus, *Langford* instructs that Luca's age-discrimination challenge to the Highland Park non-selection survives.

The Agency cites *Williams v. U.S. Postal Service*, No. 1:08-cv-892, 2010 WL 11538139 (S.D. Ohio Sept. 8, 2010), and *Cook v. Geren*, No. 3:07-0637, 2008 WL 686220 (M.D. Tenn. Mar. 7, 2008), in support of its position, but those cases are not to the contrary.  Both *Williams* and *Cook* concerned Title VII and not ADEA claims.  *See* Compl., *Williams*, No. 1:08-cv-892 (S.D. Ohio Jan. 6, 2009) ECF No. 3; *Cook*, 2008 WL 686220, at *3.

In sum, Luca's challenges to the Ann Arbor and Farmington Hills non-selections are barred, but challenge to the Highland Park non-selection is not.

## II.   Disparate Treatment Claims

Luca claims that the Agency didn't promote him at the Wyandotte, Detroit Conner, Roseville, Inkster, and Highland Park offices because of his age.[14]  Luca also claims that the Administration didn't promote him at all these offices except the Highland Park office because of his race, color, or sex.[15]  The parties agree that

---

[14] Luca also claims he wasn't promoted at the Ann Arbor office because of his age, but as discussed above that claim is barred. *See also infra* notes 16, 17.

[15] Luca also claims he wasn't promoted at the Ann Arbor office because of his sex and at the Farmington Hills office because of his race and color. But as discussed above these claims are barred. *See also infra* notes 16, 17.

the *McDonnell Douglas* framework applies to these claims. *Accord Briggs v. Potter*, 463 F.3d 507, 514–17 (6th Cir. 2006) (ADEA); *Tepper v. Potter*, 505 F.3d 508, 515–17 (6th Cir. 2007) (Title VII).

*McDonnell Douglas* has three steps. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). First, Luca must make out a *prima facie* case of employment discrimination. *Id.* Then, the burden shifts to the Agency to prove it had a legitimate, non-discriminatory reason for not selecting him. *Id.* at 253. Last, the burden shifts back to Luca to show that the Agency's proffered reasons are merely a pretext for discrimination. *Id.*

### A.   *McDonnell Douglas* Step One

The only claim for which the question of whether Luca makes out his *prima facie* claim makes any difference is his challenge to the Roseville non-selection. (For all his other claims, he makes out a *prima facie* case.) For the Roseville vacancy, the Agency solicited applicants from individuals at the GS-5 level and up. Luca applied at the GS-5 level, and the Agency admits that he should have been referred at the GS-5 and GS-11 levels. But his name did not appear on any of the BQ lists that the selection official received.

The Agency points the finger at Babiarz, who compiled the BQ lists for the Roseville vacancy. The Agency offers proofs that show that she mistakenly left other applicants off of BQ lists for that job, too. From this, the Agency infers that

Babiarz inadvertently failed to refer Luca at the GS-5 and GS-11 levels by mistake. (ECF No. 19-31); *see also supra* note 5.  The Agency concludes that it prevails at step two of *McDonnell Douglas*.  But the Agency offers no proof from which *every reasonable jury* would necessarily agree that Babiarz inadvertently failed to refer Luca at the GS-5 and GS-11 levels.

Yet Luca still cannot make out a disparate-treatment claim for Babiarz's conduct.  That is true because he cannot carry his *prima facie* burden.  He claims that he wasn't promoted at the Roseville office because of his age and sex.  To carry his *prima facie* burden he accordingly must prove, among other things, that Babiarz referred women and individuals "significantly younger" than him at the GS-5 and GS-11 levels.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (ADEA); *see also Tepper*, 505 F.3d at 515 (Title VII).

Luca cannot do that.  He offers nothing showing the ages or sex of the applicants who Babiarz referred at the GS-5 or GS-11 levels for the Roseville vacancy.  He therefore cannot prove that Babiarz's non-referral was discriminatory, which defeats his challenge to the non-referral even if the Agency's purported justification for the *non-referral* is not properly supported.  In any event, the Agency has given an unrebutted, legitimate, non-discriminatory explanation as to why the chosen candidate got the job.

## B.    *McDonnell Douglas* Step Two

Even if Luca makes out a *prima facie* case for the other non-selections at the

24

Wyandotte, Detroit Conner, Inkster, and Highland Park offices, the Agency prevails at step two of *McDonnell Douglas* for those non-selections. At the Inkster office, which was looking to hire a social insurance specialist, the selectee had completed a detail as a social insurance specialist and had received an award for workplace performance. And the Highland Park selection official picked someone with good people skills, communication, and adaptability.

The Agency offers good and legitimate reasons for the non-selections at the Wyandotte and Detroit Conner offices, too. Luca was only on the GS-11 BQ list for the vacancies at those offices, and the selection officials wanted to hire someone below the GS-11 level. And the officials wanted to hire someone below the GS-11 level because they did not want to hire a journeyman as a trainee. That makes good sense.

Luca cannot prevail on his challenges to the Wyandotte, Detroit Conner, Inkster, or Highland Park non-selections without showing pretext.[16]

## C.   *McDonnell Douglas* **Step Three**

Luca argues that the Agency's reasons for the non-selections at the Wyandotte, Detroit Conner, Inkster, and Highland Park offices were pretextual for

---

[16] The Agency also offers legitimate, non-discriminatory reasons for the Ann Arbor and Farmington Hills non-selections. Luca was less experienced than the selectee at the Ann Arbor office. And he was not referred at the GS-5 level for the Farmington Hills vacancy, and the selection official made the promotion from that list because he wanted to hire someone at the GS-5 level.

three reasons, none of which are persuasive. *First*, he argues that the selection officials' affidavits explaining the non-selections are suspect. The affidavits, Luca says, were likely manufactured by the Agency in response to this suit.

Courts cannot resolve credibility issues on summary judgment—that is the jury's job. *Anderson*, 477 U.S. at 255. But the question remains whether the selection officials' affidavits are problematic or whether Luca is grasping at straws to avoid summary judgment. In the Court's view, it's the latter. All the affidavits were signed in late 2015, years before Luca brought this suit. And Luca offers nothing undermining the officials' credibility.

*Second*, Luca argues that some of the selection officials displayed improper "favoritism" towards their selectees. (ECF No. 23, PageID.504.) According to him, favoritism counts as a prohibited personnel practice under 5 U.S.C. § 2302(b)(6). Section 2302(b)(6) prohibits federal agencies from "grant[ing] any preference or advantage not authorized by law, rule, or regulation to any . . . applicant for employment . . . for the purpose of improving or injuring the prospects of any particular person for employment." § 2302(b)(6).

Luca's reliance on § 2302(b)(6) is misplaced. Even if § 2302(b)(6) prohibited favoritism by the selection officials, favoritism is not necessarily discrimination. And Luca offers nothing showing that the officials' favoritism stemmed from discriminatory animus. *Accord Holder v. City of Raleigh*, 867 F.2d

823, 826 (4th Cir. 1989); *Schobert v. Ill. Dep't of Transp.*, 204 F.3d 725, 733 (7th Cir. 2002); *Ladenberger Plymouth-Canton Cmty. Schs.*, No. 16-14170, 2018 WL 3914709, at *5–9 (E.D. Mich. Aug. 16, 2018).

*Third*, Luca says that his qualifications were better than the selectees' qualifications. "Whether qualifications evidence will be sufficient to raise a question of fact as to pretext . . . depend[s] on whether a plaintiff presents other evidence of discrimination." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006). Where, as here, "there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627.

Here, the Wyandotte, Detroit Conner, Inkster, and Highland Park selection officials reasonably could have chosen the selectees over Luca for the simple fact that the selectees had been referred at the GS-9 level and below, and he had only been referred at the GS-11 level. Thus, so long as the selectees were minimally qualified, the officials reasonably hired them and not Luca because Luca would have cost more. And for nearly all the selections, Luca offers nothing showing that he should have been referred at lower GS levels under the Plan.

The only exception is the Roseville non-selection. Under the Plan, Luca

should have been referred to the Roseville selection official at the GS-5 and GS-11 levels. But as discussed above, Luca fails to make out a *prima facie* claim for that non-selection, so his superiority to other applicants who were referred at the GS-5 and GS-11 levels is irrelevant.

In sum, no reasonable jury would find that Luca made out disparate-treatment claims in connection with the Roseville non-selection. And no reasonable jury would find that the Agency's legitimate, non-discriminatory reasons for the non-selections at the Wyandotte, Detroit Conner, Inkster, and Highland Park offices were pretextual.[17]  His disparate-treatment claims fail.

## III.   Retaliation Claims

Luca brings retaliation claims. He claims that the Agency didn't promote him at the Wyandotte, Detroit Conner, and Inkster offices because of his prior enforcement activity under the ADEA and Title VII.[18]  The parties agree that *McDonnell Douglas* governs these claims. *Accord Scott v. Potter*, 182 F. App'x 521, 523–27 (6th Cir. 2006) (ADEA); *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–97 (6th Cir. 2009) (Title VII).

---

[17] The same is true for the Ann Arbor and Farmington Hills non-selections.

[18] Luca also claims that he wasn't promoted at the Ann Arbor and Farmington Hills offices based on his prior enforcement activity under the ADEA and Title VII. But as discussed above, those claims are barred. *See also infra* note 19.

As discussed above, *McDonnell Douglas* has three steps.  First, Luca must prove *prima facie* retaliation: (1) that he "engaged in activity protected by [the ADEA or] Title VII"; (2) that "this exercise of protected rights was known to" the Agency; (3) that the Agency "thereafter took adverse employment action against" him; and (4) that "there was a causal connection between the protected activity and the adverse employment action."  *Hunter*, 565 F.3d at 996 (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)).  Then, the burden shifts to the Agency to show a legitimate, non-discriminatory reason for the adverse action, and then back again to Luca to show pretext.  *See id.*

Even assuming, *arguendo*, that Luca could prove knowledge of protected activities *and causation*—which is not apparent from his proofs—his retaliation challenges to the Wyandotte, Detroit Conner, and Inkster non-selections fail for the same reasons as his disparate-treatment challenges to those claims.  The Agency had legitimate, non-discriminatory reasons for those non-selections, and he cannot prove pretext.  No reasonable jury would find that Luca wasn't promoted at the Wyandotte, Detroit Conner, and Inkster offices because of his prior activity protected by the ADEA or Title VII.[19]

---

[19] The same is true for Luca's retaliation challenges to the Ann Arbor and Farmington Hills non-selections. *See supra* notes 16, 17.

## CONCLUSION & ORDER

All Luca's claims fail.  Accordingly, **IT IS ORDERED** that the Agency's

motion (ECF No. 19) is **GRANTED**.

**IT IS SO ORDERED**.

Dated: September 29, 2025

_____
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE